17728

Annie Lee Wells CORLEY and Richard Kendrick Corley, Respondents, v. SOUTH CAROLINA TAX COMMISSION and State Workmen's Compensation Fund, Appellants.

(117 S. E. (2d) 577)

440

*Messrs. Daniel R. McLeod, Attorney General, David Aiken, Assistant Attorney General, Whaley & McCutchen, Hoover C. Blanton,* and *Donald V. Richardson, III,* all of Columbia, *for Appellants,*

*Messrs. Edens, Hammer & Glenn,* of Columbia, and *Callison & Dorn,* of Greenwood, *for Respondents,*

December 15, 1960.

OXNER, Justice.

This is a proceeding to recover workmen's compensation for the death of Albert J. Corley which occurred between the hours of 5:00 and 6:00 o'clock on the morning of October 24, 1958 as a result of an automobile accident. He had gone to Columbia on the previous day and was returning to his home in Greenwood, South Carolina, when he received the fatal injuries. The distance between these two cities is approximately 75 miles. The hearing Commissioner concluded that the trip to Columbia was made for decedent's own personal pleasure and denied compensation to his dependents. Upon review by the full Commission, this finding was reversed. The majority concluded that the work of decedent as a field agent of the Sales Tax Division of the South Carolina Tax Commission necessitated the journey to Columbia, or at least that it was one of the causes which impelled him to make that trip, and awarded compensation. On appeal to the Circuit Court, this award was affirmed. The appeal to this Court by the employer and the State Workmen's Compensation Fund followed.

Of course, it is the exclusive function of the Industrial Commission to settle questions of fact. The limit of the inquiry which this Court is permitted to make is whether there is any evidence reasonably tending to support the conclusions of the Commission.

The duties of decedent as a field agent of the Tax Commission included making investigations as to any unpaid

sales taxes, handling assessments and delinquent accounts, and occasionally assisting in making audits. His territory was restricted to Greenwood County and some adjacent areas. His immediate superior, Mallon P. Harris, a district supervisor, resided in Greenville. When decedent or any other field agent under Harris' supervision found it necessary to leave his territory, he was supposed to notify Harris' office, although he was at liberty to do so without permission in the event of an emergency. Occasionally it became necessary for a field agent to make a trip to Columbia to examine the files at the office of the Tax Commission.

The State Fair is held annually in October at Columbia. Until this year the Carolina-Clemson football game was played on Thursday of the week of the fair. This is always quite a colorful occasion attended by people throughout the State. It is referred to in the testimony as "Big Thursday", and is a legal holiday in Columbia. Section 64-152 of the 1952 Code. The testimony shows that the offices of the Tax Commission, as well as all other State offices in Columbia, are closed on that day. Each year the Tax Commission sends a memorandum to the district supervisors, stating that the Columbia office would be closed but that the district offices would remain open with all employees on duty unless they were going to the football game, in which event they could have a holiday. In 1958 this notice was not received by Harris until October 22nd, the day before the game, and, consequently, he did not have time to issue a memorandum and send it to the employees under his supervision.

During the early part of the week of the fair, decedent expressed to several friends some uncertainty as to whether he would be able to attend the game. His wife testified that he later told her it would be necessary for him to make a trip to Columbia to pick up some "transcripts and returns" to enable him to finish an audit; that on Wednesday, October 22nd, he tried unsuccessfully to contact Harris in Greenville by telephone so as to advise him of the necessity of going to Columbia to get the records; and that about 7:45

the following morning, the day of the game, he again tried to telephone Harris but was informed that he had gone to Columbia. According to her testimony, decedent remarked to her before leaving home that he "would just go on to Columbia and see him (Harris) down there" and would also pick up the transcripts and returns, but that it would be necessary for him to get to Columbia before 12:00 o'clock as the offices of the Tax Commission would probably be closed that afternoon.

It further appears that on Monday or Tuesday before the game Mr. Woodle, then senator from Greenwood County, told decedent that he wanted his assistance in a matter which he wasn't ready to discuss because he desired to first get some additional information. In trying to find a time when the two could conveniently meet, Senator Woodle said he would be in Greenwood all the week except Thursday, to which decedent replied: "Well, I am going to be in Columbia Thursday on business myself." They then arranged to meet at 1:00 o'clock at the fairground.

After leaving home about 8:30 on Thursday morning, decedent went to a cafe in Greenwood where he invited several friends to go with him to the game but stated that he would have to take his car as he had some work to do on the trip. One declined the invitation because he did not want his trip interrupted while decedent made business calls. Another of these friends, J. H. Hall, accepted. Hall and decedent then went in the latter's car to the Town of Ninety Six, a distance of approximately ten miles, where decedent attended to some tax business. The two men returned to Greenwood about 9:30 that morning where at a service station they ran across Henry S. Langston who was also invited to make the trip. Decedent, Hall and Langston left Greenwood about 10:00 o'clock and proceeded directly to Columbia. They passed through the city without stopping and went to a business establishment at Five Points, a shopping center in Columbia, which was operated by J. H. Epps, another friend of decedent. Upon arriving there about 12:00 o'clock or

shortly before, the three men got out of the car and went in this place of business, decedent taking his briefcase with him. Epps expressed surprise at seeing decedent as he had previously said he would be unable to attend the game, to which decedent replied: "Well, I didn't know until a few minutes ago or until this morning that I was going to come down." Hall and Langston were introduced to Epps who invited all three men to have lunch. He had some food in a room back of his office to take care of any friends who called. Decedent stated that before eating he would like to use the 'phone "to get a little information." Epps testified that while he did not hear the conversation and did not know what it was about, he did observe decedent using the 'phone and while doing so he had his briefcase open and was scratching on a pad which Epps kept on his desk. After this call, decedent and Langston ate lunch. Hall did not eat anything because he was on a diet. The three men left Epps' place of business between 12:30 and 1:00 and went directly to the fairground.

Decedent met Senator Woodle at the fairgrounds promptly at 1:00 o'clock as previously agreed upon. Due to the fact that decedent had with him two friends and Senator Woodle was accompanied by his wife, it was decided to postpone the discussion and the two men agreed to meet in Greenwood between 7:30 and 8:00 the next morning. Shortly after this meeting, Langston left Hall and decedent as he had to get a ticket. Hall and decedent sat together at the football game. After it was over the three men got together again and went to various places around the midway. All had some whiskey but there is no evidence that any of them became intoxicated. Hall became separated from decedent and Langston around 9:00 o'clock and after being unable to find them, proceeded to the city where he caught a 12:45 A. M. bus for his home in Greenwood. Later about 10:30 that night Langston and decedent, while watching some shows along the midway, became separated. Langston

was unable to find him, caught a ride to the city and also went home on the 12:45 bus.

The record does not disclose the whereabouts of decedent or what he did after he became separated from Hall and Langston. As previously stated, between five and six o'clock the next morning while returning home, his car was in collision with a truck a few miles south of Greenwood.

Harris testified that he knew of no business which would have necessitated decedent's making a trip to Columbia. The briefcase in the car was carefully examined after the accident and nothing was found therein indicating any business to be attended to in that city.

It is conceded that the trip to Columbia served a personal purpose of allowing decedent to attend the football game but respondents say the primary purpose was a business one. This necessitates consideration of the dual purpose trip doctrine which we had occasion to discuss in *Sylvan v. Sylvan Bros., Inc.,* 225 S. C. 429, 82 S. E. (2d) 794, 797. We there quoted with approval the following from Section 18 of Larson's Workmen's Compensation Law: "Injury during a trip which serves both a business and a personal purpose is within the course of employment if the trip involves the performance of a service for the employer which would have caused the trip to be taken by someone even if it had not coincided with the personal journey." This is in line with the following language of Judge Cardozo in the celebrated case of *Marks' Dependents v. Gray,* 251 N. Y. 90, 167 N. E. 181, 183:

"We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled. * * * The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.

\*   \*   \*   If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk."

The burden was upon respondents to prove that decedent's work had at least a part in creating the necessity of the trip to Columbia. Of course, this could be shown by circumstantial evidence. Strongly relied on as a circumstance are the declarations by him as to his purpose. The admissibility of this testimony is conceded under the authority of *Ervin v. Myrtle Grove Plantation,* 206 S. C. 41, 32 S. E. (2d) 877, and in *Malphrus v. State Commission of Forestry,* 221 S. C. 75, 69 S. E. (2d) 70. But decedent's intentions as disclosed by these declarations must be evaluated in the light of his later acts, "since for many reasons the cup of intention and the lip of action may never meet." McCormick on Evidence, page 571. On page 574, this author says: "Declarations of intention to show circumstantially the later conduct of the declarant are obviously subject, like all circumstantial inferences, to hazards of miscarriage. The declarant may change his mind or he may find it impossible to carry out his purpose."

In considering these declarations, it will be first noted that some of them, particularly decedent's statement that it would be necessary to use his car, were made prior to the trip to Ninety Six, which admittedly was on business. This may have been the business transaction he had in mind since the town of Ninety Six is not much out of the way in going from Greenwood to Columbia. His statement to his wife before leaving home to the effect that he was going to Columbia to pick up some records at the office of the Tax Commission is rather difficult to understand in view of the fact, which he must have known, that the office would be closed on that day. But assuming that such was his intention, his subsequent conduct clearly shows that he

changed his mind. Although he told his wife it would be necessary to get to Columbia by 12:00 o'clock as the office would be closed that afternoon, when he reached that city around noon he made no effort to go by the office of the Tax Commission. Instead he went through the main part of Columbia without stopping and made a social call on a friend at Five Points, after which he went directly to the fairgrounds.

We now consider two incidents during decedent's stay in Columbia relied upon by respondents as showing that he carried out his purpose of making a business trip. The first is the fact that he made a 'phone call, with his brief-case open before him, while at the office of his friend at Five Points. But we do not know to whom he talked or what he talked about. It is rather unreasonable to suppose that he was calling the office of the Tax Commission or anyone connected with it since the office was closed. Moreover, his supervisor testified that he knew of no business decedent had to attend to in Columbia nor did any of the contents of his briefcase relate to the transaction of such business. It would be pure speculation to say that this telephone call was for business purposes.

In *Fowler v. Abbott Motor Co.*, 236 S. C. 226, 113 S. E. (2d) 737, 739, testimony similar to that above mentioned was held to be insufficient to show the transaction of business for the employer. In the *Fowler case* claimant was employed as a mechanic and service manager by an automobile dealer who furnished him with an automobile to use in answering service calls and paid the toll charges for a telephone located at his residence. He was subject to call any hour of the day or night. About eight o'clock one night, while driving his employer's automobile, he had an accident. The proof on the question of whether the claimant was on the business of his employer when the accident occurred consisted of testimony to the effect that shortly before leaving on this trip claimant answered a telephone call at his home and was heard to tell the caller "I'll see

about it", after which he told the members of his family, "I'll be back in a minute," and further testimony that after leaving home he stopped by a country store where he inquired about his uncle and said something to the effect that he had to see about a car motor. This testimony was held insufficient to support a finding that claimant's injury arose out of and in the course of his employment. The Court stated that the mere possibility that an employee was engaged in performing service on behalf of his employer at the time of his accidental injury was insufficient.

The other circumstance relied on to show that this was a business trip is the fulfillment of the engagement which decedent had with Senator Woodle at the fairgrounds. It could not be reasonably inferred from the evidence that this engagement created the necessity for the trip to Columbia or had any part in causing it. Both of these parties lived in Greenwood. Senator Woodle said that the matter he wished to discuss with decedent was of a local nature and so far as he knew involved nothing requiring a trip to Columbia. If for some reason the football game had been cancelled, the only reasonable inference from the evidence is that decedent would not have made the trip and would have seen Senator Woodle at some convenient time in Greenwood. It is equally true that if Senator Woodle had called off his appointment, decedent would have nevertheless gone to Columbia. In short, it could not be reasonably inferred that the matter which Senator Woodle desired to discuss sent decedent on his journey. Meeting the Senator in Columbia was a mere incident to the trip.

We conclude that any inference from decedent's declarations that his work as field agent of the Tax Commission sent him on this trip to Columbia was completely rebutted by his subsequent conduct. Either Hall or Langston was continuously with him from the time he left Greenwood until approximately 10:30 that night. We find nothing said or done during this period which could reasonably have been said to have caused the journey or

to have been a concurrent cause. Of course, we do not know what decedent did from 10:30 that night until he left for Greenwood early the next morning but it certainly would not be assumed that during that time he attempted to do any business.

In view of the foregoing conclusion, we need not pass upon the further interesting question raised by appellants to the effect that even if decedent made a business trip to Columbia, his social activities after his business was completed extended over such length of time as to remove him from the orbit of his employment in returning home. In this connection, see *Dooley v. Smith's Transfer Co.*, 57 A. (2d) 554, 26 N. J. Misc. 129; *White v. Frank Z. Sindlinger, Inc.*, 30 N. J. Super. 525, 105 A. (2d) 437.

Judgment reversed and case remanded to the Circuit Court for the purpose of vacating the award and dismissing the claim for compensation.

STUKES, C. J., and TAYLOR, LEGGE and Moss, JJ., concur.